IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAGGIE W.,                          )
                                    )
              Plaintiff,            )
                                    )
v.                                  )     Civil Action No. 1:22cv1157 (CMH/JFA)
                                    )
COMMISSIONER OF                     )
SOCIAL SECURITY,                    )
                                    )
              Defendant.            )
_____ )

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) on a motion for summary judgment. (Docket nos. 18).

Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Kilolo

Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"),

denying plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act.

The Commissioner's final decision is based on a finding by the Administrative Law Judge

("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that

plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to
Local Civil Rules 5 and 7(C). (Docket no. 13). In accordance with those rules, this report and
recommendation excludes any personal identifiers such as plaintiff's social security number and
date of birth (except for the year of birth), and the discussion of plaintiff's medical information is
limited to the extent necessary to analyze the case.

1

## I. PROCEDURAL BACKGROUND

Plaintiff previously applied for DIB on September 5, 2011 with an alleged onset date ("AOD") of October 15, 2009. (AR 102). That application was denied by the Social Security Administration ("SSA") on initial review on October 26, 2011 and on reconsideration on February 27, 2012. *Id.* A hearing took place before ALJ Ayer on February 12, 2014, and plaintiff was represented by Giovanny Ricaldes. *Id.* On April 7, 2014, ALJ Ayer issued a decision finding that plaintiff was not disabled under sections 216(i) and 223 of the Social Security Act for the period of October 15, 2009 to December 31, 2010, plaintiff's date last insured ("DLI"). (AR 99–109).

On May 20, 2013, plaintiff filed an application for disability insurance.[2] (AR 832). That application was granted on initial review on February 14, 2014 with an established onset date of May 20, 2013. (AR 832–47).

Plaintiff filed the application for DIB currently under consideration on May 28, 2015.[3] (AR 157–58, 185–93). Plaintiff listed the AOD as June 30, 2005, and it was determined the DLI was still December 31, 2010.[4] (AR 157, 175). On initial review, the SSA determined that plaintiff was not disabled for the relevant period. (AR 75–85, 110–14). Plaintiff requested reconsideration of the denial (AR 115), and the SSA affirmed its denial (AR 87–98, 116–18).

---

[2] There appears to be some confusion throughout the Administrative Record as to whether this application involves disability insurance or supplemental security income ("SSI"). The application and disability determination explanation state that the claim is for disability insurance under Title XVI. (AR 832–47). However, plaintiff and her representative seemed to believe that she was receiving SSI. (AR 14, 43, 228, 763).

[3] While the application material lists June 9, 2015 as the date received, ALJ Kotval's decision lists May 28, 2015 as the date that plaintiff filed the application. (AR 9).

[4] In her complaint, plaintiff lists the AOD as March 24, 2004. (Docket no. 1 at 4). However, the undersigned will proceed with the AOD as June 30, 2005, as that date is listed on the application and all other documents.

On January 5, 2016, plaintiff requested a hearing before an ALJ. (AR 119–20). Plaintiff initially requested the case be decided on written evidence, but she later opted to have a hearing. (AR 135–43).

The hearing before ALJ Kotval took place on January 30, 2018. (AR 31–74). Plaintiff appeared unrepresented, and she executed a waiver of right to representation. (AR 40, 154). Plaintiff provided testimony and answered questions posed by the ALJ. (AR 42–65). A vocational expert also answered questions from the ALJ. (AR 65–72).

On May 2, 2018, ALJ Kotval issued a decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2010, the last date insured. (AR 6–25). On July 5, 2018, plaintiff requested review of the ALJ's decision by the Appeals Council. (AR 155–56). The Appeals Council denied plaintiff's request on February 27, 2019. (AR 1–5). On May 1, 2019, plaintiff filed a complaint in this court requesting review of the Commissioner's decision. (AR 818–20); *see Maggie W. v. Berryhill*, Case No. 1:19-cv-0527-LO-JFA (E.D. Va. 2019). Upon request by the parties, the case was remanded to the SSA for further consideration. (AR 821–26). The Appeals Council remanded the case to ALJ Kotval on January 17, 2020. (AR 827–31).

A second hearing before ALJ Kotval took place on July 16, 2020. (AR 759–92). Plaintiff appeared with Stephen Shea as her representative. (AR 762). Plaintiff again provided testimony and answered questions from the ALJ and her representative. (AR 769–79). A vocational expert answered questions from the ALJ and plaintiff's representative. (AR 782–89).

On September 10, 2020, ALJ Kotval again issued a decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act at any time from June 30, 2005, the AOD, through December 31, 2010, the DLI. (AR 735–52). On November 3, 2020,

plaintiff submitted additional evidence to the Appeals Council from Dr. Benson W. Yu. (AR 723–33). On October 20, 2021, the Appeals Council granted plaintiff an extension of time to submit written exceptions to ALJ Kotval's decision. (AR 718–19). Mr. Shea withdrew as plaintiff's counsel on November 8, 2021. (AR 717). On November 22, 2021, plaintiff submitted exceptions to ALJ Kotval's decision. (AR 941–52). The Appeals Council denied plaintiff's request to review ALJ Kotval's decision on April 27, 2022. (AR 712–16). As a result, the ALJ's decision became the final decision of the Commissioner, and plaintiff was given sixty (60) days to file a new civil action challenging that decision. (AR 713); *see* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff received an extension of time to file a civil action on September 10, 2022. (AR 707–11).

On October 14, 2022, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On June 13, 2023, the court set a briefing schedule for the parties to submit motions for summary judgment. (Docket no. 15). The Commissioner filed a motion for summary judgment on July 13, 2023. (Docket no. 18). Plaintiff filed an opposition to the motion for summary judgment on July 27, 2023. (Docket no. 21). The Commissioner filed a reply on August 4, 2023. (Docket no. 23). The case is now before the undersigned for a report and recommendation on the Commissioner's motion for summary judgment. (Docket nos. 15, 18).

## II. STANDARD OF REVIEW

Under the Social Security Act, the district court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial

4

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty, and not that of the reviewing court, to resolve evidentiary conflicts, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### III. FACTUAL BACKGROUND

#### A.     Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1973 and was thirty-two (32) years old at the time of the alleged onset of disability. (AR 157). Plaintiff reported completing high school in China and earning an associate's degree from NOVA Community College. (AR 600). Plaintiff previously worked as a cashier, bookkeeper, and clerk. (AR 44–47, 67–68, 242). Beginning in 2000, she worked for Nextel Communication for four years doing data entry and analysis. (AR 47–48, 242). She then worked for XO Communications from May to July 2005 also doing data entry and analysis. (AR 48–49, 242). Plaintiff testified that she was involuntarily terminated from XO Communications. (AR 49). Plaintiff stopped working on June 30, 2005. (AR 186).

### B.   Overview of Plaintiff's Medical History and Treatment[5]

A brief overview of plaintiff's medical history and a short summary of her treatment is provided to give a framework for the more detailed discussion of plaintiff's medical issues and claims that follows.  Plaintiff's medical history includes diagnoses of acute psychosis, paranoid personality disorder, delusional disorder, episodic mood disorder, obsessive-compulsive disorder, anxiety, gastroesophageal reflux disease ("GERD"), Meniere's disease, fibromyalgia, joint pain, peptic ulcer disease, neurodermatitis, and trichotillomania.  (AR 265, 310, 321, 374, 581, 588, 602, 729).

*i. Medical Treatment Prior to Alleged Onset Date*

In March 2004, after plaintiff asked a police officer for water because she was dehydrated, she became belligerent and stated that she saw Chinese characters in the sky.  (AR 372).  Plaintiff was brought by paramedics to INOVA Fair Oaks Hospital.  (AR 372, 374).  At the hospital, plaintiff again reported that she was experiencing visual and auditory hallucinations and was given IM haloperidol.  (AR 374).  Plaintiff was described as having difficulty coordinating thoughts, somewhat confused and in fear about hearing voices talking to her in Chinese, somewhat grandiose and suspicious of the purpose of her hospitalization, and refusing to give much information about her past or present relationships.  *Id.*  However, plaintiff did calm down considerably after being admitted to the emergency room.  *Id.*  Plaintiff stayed in the hospital four or five days, but she did not participate in activities and refused all medication

---

[5] The AR contains nearly five hundred (500) pages of medical records from various sources relating to plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every medical treatment.  While the relevant period for plaintiff's application is June 30, 2005 to December 31, 2010, this overview will still summarize the medical evidence outside of that period.

provided, as she was convinced that she did not need to be in the hospital. *Id.* She was diagnosed with acute psychosis and paranoid personality, and she was ultimately discharged unimproved. *Id.*

Roughly a week after she left the hospital, Dr. Yu provided plaintiff with an excuse slip for medical leave that requested plaintiff work half days. (AR 576–80). She had a follow up appointment with Dr. Yu on March 31, 2004, where plaintiff reported psychosis after her hospital discharge, panic attacks, auditory hallucinations, and ringing in her ears. (AR 727). She stated her panic attacks and confusion started in 2001 and episodes would last a few days. *Id.* She also reported self-isolating, left-side chest pain, palpitations, and sweating. *Id.* Dr. Yu prescribed plaintiff Lorazepam and Seroquel, referred her to a psychiatrist, and encouraged her to reduce her work hours to five hours per day for the next two to four weeks. *Id.*

### ii. Medical Treatment from Alleged Onset Date to Date Last Insured

No medical evidence exists in the record for the period between March 2004 and November 2009. In November 2009, plaintiff had an appointment with Dr. Yu where she reported that she had self-isolated since 2004 without any medical care. (AR 728). She stated that she had paranoia from her 2004 hospital stay and that her auditory hallucinations had been constant dating back to 2004. *Id.* She also reported that she was taking college courses once a week by mail, but she was unable to take care of herself when taking courses. *Id.* Plaintiff noted that she had an unbearable stomachache in 2007, had only taken bismuth for it, and the pain was worse when eating solid food. *Id.* Dr. Yu noted that the chest pain was likely atypical GERD. *Id.* An electrocardiogram ("EKG") was performed and the results were normal. (AR 553). Plaintiff tested positive for H. Pylori AB IGG and Hepatitis B virus in December 2009. (AR 253, 466).

Plaintiff had another appointment with Dr. Yu in March 2010, and she reported pain when she turned her torso. (AR 729). Dr. Yu observed symptoms of paranoia, delusional thoughts, fear of anesthesia without reason, and refusal to get endoscopy. *Id.* Dr. Yu's assessment of plaintiff included GERD and paranoid personality disorder. *Id.* Plaintiff was encouraged to continue taking a proton pump inhibitor ("PPI") like Prilosec OTC or Prevacid to treat her GERD. *Id.* In December 2010, plaintiff called Dr. Yu's office to request a house call due to immobility from pain in her left chest and center abdominal, as well as increased auditory hallucinations. (AR 730). Plaintiff could not communicate effectively to arrange transportation. *Id.* Plaintiff was urged to call 911, as the clinic could not send an ambulance because she did not communicate where she lived and the address on file was a P.O. Box. *Id.*

### iii. *Medical Treatment after Date Last Insured*

During a February 2011 appointment with Dr. Yu, plaintiff reported that the pain was unbearable in June 2010, she vomited blood in September 2010, and she was immobilized in November and December 2010. (AR 731). Dr. Yu found that plaintiff's symptoms were most likely due to GERD, differentials peptic ulcer disease, and/or a hiatal hernia. *Id.* Plaintiff was again referred to psychotherapy and encouraged to continue taking a PPI. *Id.*

Plaintiff continued to return to Dr. Yu for various physical ailments. In May 2011, Dr. Yu prescribed plaintiff Nexium for her GERD. (AR 255–56). In July 2011, plaintiff reported a stomachache, shoulder scapular pain, neck pain, left hand and leg numbness, and a rash. (AR 471). Dr. Yu prescribed Celebrex for plaintiff. *Id.* A radiologic examination of her chest and spine by Dr. Michael A. Weiss later that month indicated some mild degenerative spurring in her mid-thoracic spine, but otherwise the findings were unremarkable. (AR 477–78). In August 2011, plaintiff reported dizziness, earache, and tinnitus, which Dr. Yu indicated could be the

result of vertigo and Meniere's disease. (AR 469). Dr. Yu prescribed meclizine and Mucinex D. (AR 470). In September 2011, plaintiff underwent a CT scan of her sinuses, an ultrasound of her abdomen, and a radiology examination of her esophagus, which were all relatively unremarkable except for a deviation of the naval septum and mucosal disease in the floor of the maxillary sinus. (AR 434–37). Plaintiff then reported stomach pain in February 2012, which led to Dr. Yu prescribing a trial of Pepcid, Dexilant, and Reglan. (AR 548). In September 2012, plaintiff visited a dizziness and balance center, where a complete audiogram and electrocochleography testing was suggestive of early Meniere's disease in the right ear. (AR 491–93, 581). Dr. Eric J. Furst recommended plaintiff take lipoflavonoids daily. (AR 581).

Dr. Yu wrote a letter to the SSA on October 12, 2012 detailing plaintiff's conditions. (AR 582–83). Dr. Yu explained that plaintiff was first seen for abdominal pain, chest pain, and palpitation in November 2009. (AR 582). He noted plaintiff had a history of abdominal pain, dysphasia, chronic dizziness, vomiting blood, abnormal esophageal contractions, chest pain, and palpitations. *Id.* He further stated that plaintiff's conditions became worse since her appointment in March 2010, partially due to the adverse effect of medication, and she was unable to leave home and had difficultly performing daily living activities. *Id.* Dr. Yu also opined that vertigo kept plaintiff from performing analytical tasks to keep her job as a business data analyst, as she would have to spend time sitting or lying down to ride out attacks. *Id.* Dr. Yu remarked that plaintiff had three chronic severe medical conditions: GERD, chronic Hepatitis B viral infection, and chronic Meniere's disease. (AR 583). Dr. Yu stated that these conditions limited plaintiff's ability to walk, stand, lift, bend, and concentrate, and they restricted her from working since 2004. *Id.* He concluded that these conditions were chronic, severe, and expected to be life-long, resulting in permanent inability to do work-related activities. *Id.*

In March 2013, Dr. Inia I. Yevich-Tunstall noted that plaintiff's tendency to scratch her scalp, which caused sores and left excoriated lesions, was compatible with trichotillomania. (AR 588). Dr. Yevich-Tunstall recommended plaintiff speak with her primary care physician about it and get secondary care from a psychiatrist for help with her anxiety. *Id.* During late 2014, plaintiff sought treatment for Vitamin D deficiency, Hepatitis B, arm pain, thigh pain, and chest tenderness. (AR 611–13, 617–20, 630–43). In 2015, she went to the emergency room, an ophthalmologist, and then a retina specialist after a heavy object fell off a shelf and hit her in the eye. (AR 260–61, 273–75, 279–83, 604, 625–26, 658). She was diagnosed with atrophic holes and lattice degeneration. (AR 658).

Throughout her treatment, doctors regularly referred plaintiff for psychiatric treatment. (AR 263, 628, 631, 727, 731). Finally, in June 2015, plaintiff attended an appointment with Dr. Sarah Elizabeth Iannucci at INVOA Psychiatric Assessment Center ("PAC") to establish care, where she was diagnosed with obsessive-compulsive disorder, episodic mood disorder, and anxiety. (AR 265–69). Plaintiff was prescribed asenapine maleate and encouraged to follow up. (AR 265–66). Plaintiff also attended three counseling sessions with Phoenix Counseling Services in June 2015, but the notes are difficult to read. (AR 662–66). Plaintiff then attended appointments with Norman M. Jacobowitz, NP, at INOVA PAC in September 2015 and February 2016. (AR 284–85, 675–78). During the February 2016, appointment, plaintiff stated she lost her medication and could not take Hydroxyzine due to her stomach being upset, but she said she still took it anyway. (AR 675). Plaintiff expressed an interest in seeing a psychotherapist during the session. *Id.* Nurse Jacobowitz also noted that plaintiff was a "diagnostic conundrum in that she consistently fails to give a comprehensive history or identify a reason for seeking help. She refuses psychiatric care but states she wants to see a therapist but

will not articulate why. There is an element of paranoia in some of her thought content but it is vague as well." (AR 676).

In March 2016, plaintiff saw Dr. Minninder J. Sandhu. (AR 302–05, 679–82, 695). Plaintiff reported auditory hallucinations, racing thoughts, distractibility, increased energy, and impulsivity, on top of her regular physical health complaints. (AR 679). Dr. Sandhu noted plaintiff's long history of not wanting to take psychiatric medication but relayed that plaintiff reported sometimes taking Hydroxyzine even though it made her groggy. *Id.* Plaintiff reported that she did see a psychotherapist, Roseo Stark, in 2015 but stopped going due to her physical symptoms. *Id.* Dr. Sandhu diagnosed plaintiff with psychosis, agoraphobia with panic attacks, and history of OCD, as well as prescribing plaintiff with Olanzapine and continuing Hydroxyzine. (AR 682). Dr. Sandhu recommended plaintiff follow up a month later and continue seeing her therapist. *Id.*

Throughout 2016 and 2017, plaintiff continued visiting doctors for her physical health problems. Dr. Yingxue Zhang diagnosed plaintiff with fibromyalgia. (AR 310). When plaintiff went to visit her family in China, she had a colonoscopy and endoscopic polypectomy. (AR 316–19). She continued to have problems with abdominal pain, palpitation, weakness, and other physical problems. (AR 328).

In September 2018, plaintiff was admitted to INOVA Mount Vernon Hospital. (AR 1038–68). She reported not sleeping for a week and not knowing which medications she should take. (AR 1040). She claimed she was stressed due to hearing multiple voices consistently and being unable to do anything. *Id.* Plaintiff was admitted voluntarily to stabilize her psychotic symptoms since she was not functioning. *Id.* Plaintiff was prescribed Luvox and Abilify, but she never took them. (AR 1043). At her request, she was then prescribed Bentyl for her

11

gastrointestinal problems, but she requested to be taken off the medication two days later. *Id.*
She was ultimately discharged in stable condition. (AR 1044).

Plaintiff attended an appointment in March 2019 with Dr. Anjali Garg to establish care.
(AR 1116–20). Plaintiff was again referred to a psychiatrist to see on a regular basis. (AR
1119). Dr. Garg referred her to see a psychiatrist once again in May 2019. (AR 1123). Plaintiff
visited Dr. Sandhu in January 2020, where he recommended plaintiff continue taking Luvox and
Hydroxyzine, stop taking Asenapine, start taking Invega, and start seeing a therapist. (AR 1071).

### iv. Consultative Examinations

In addition to her medical treatment, plaintiff also underwent several consultative
examinations as part of the process for her SSA applications. In May 2013, Dr. Dev R. Chhabra
examined plaintiff, finding that she had anxiety, left shoulder pain, lower back pain, as well as a
history of Hepatitis B, Meniere's disease, and GERD. (AR 585–87). The results of her
neurologic examination were normal. (AR 586). Dr. Chhabra determined plaintiff was able to
sit for eight hours with normal breaks, stand and walk up to six hours with frequent breaks, did
not need assistive devices for ambulation, could be expected to lift and carry about fifteen
pounds frequently and twenty pounds occasionally, had limitations on bending, stooping,
crouching, and squatting in that she should only do them occasionally, manipulative limitations
on the left upper extremity, and no environmental limitations. (AR 586–87).

Dr. Ewa Badday also conducted an examination in January 2014. (AR 590–96). Dr.
Badday noted that plaintiff had problems involving her left shoulder, left arm, and vertigo, but
plaintiff did not appear to suffer any significant sequelae, had no shoulder pain or deformity, and
only had a mild deficit in range of motion. (AR 595). Her neurologic exam was normal. (AR
593). Dr. Badday determined plaintiff could be expected to sit, stand, and walk normally in an
eight hour workday with normal problems, did not need an assistive device, could be expected to

lift and carry at least fifty pounds frequently and seventy-five pounds occasionally, had no limitations on bending, stooping, crouching, and squatting, and had no manipulative, visual, communicative, or environmental limitations. (AR 595–96).

Dr. Deborah D. Gambles provided a consultative psychological evaluation in February 2014. (AR 599–603). Dr. Gambles observed that plaintiff was guarded and suspicious throughout the interview, which made it difficult to establish and maintain a rapport. (AR 601). Dr. Gambles described plaintiff's behavior as bizarre, but plaintiff denied auditory and visual hallucinations. *Id.* Dr. Gambles found plaintiff to be alert and oriented, even though her conversation was not always goal oriented, and she was obsessed with how she was perceived by others. *Id.* Dr. Gambles determined that plaintiff exhibited overt signs of mild anxiety, her immediate memory appeared impaired, and her judgment and insight was poor. *Id.* Dr. Gambles found plaintiff's behavior to be consistent with delusional disorder, depression, and paranoid personality disorder, but her symptoms were not consistent with anxiety disorder or PTSD. *Id.* Dr. Gambles concluded that plaintiff's psychological functioning was markedly impaired, and plaintiff was unlikely to be able to function in a competitive work environment. (AR 602).

### v. *State Agency Assessments*

In July and August 2015 plaintiff's DIB application was reviewed at the initial stage by Dr. Joseph Leizer and Dr. Richard Surrusco. (AR 75–85). Regarding mental health, Dr. Leizer noted that there were no medical records concerning any mental impairments beyond plaintiff's hospitalization in 2004. (AR 82–83). As to physical health, Dr. Surrusco wrote that plaintiff was diagnosed with GERD and subscapular muscle pain, but plaintiff was prescribed medication for both, and they were non-severe. (AR 82). Both determined that plaintiff was not disabled. (AR 84). They concluded that the evidence in plaintiff's file was not sufficient to fully evaluate her claim as to her condition prior to DLI and the evidence needed could not be obtained. *Id.*

On reconsideration, Dr. Nicole Sampson evaluated plaintiff's DIB application in October 2015. (AR 87–98). At that time, plaintiff had supplied information that she was diagnosed with conditions on June 26, 2015, and was told those conditions may have contributed to her hospitalization in 2004, along with other physical medical conditions that had been affecting her since 2006 or 2007. (AR 88). Dr. Sampson found that plaintiff's physical impairments of GERD and subscapular muscle pain were treated and non-severe during the relevant period. (AR 94). As for the mental health analysis, Dr. Sampson determined there was no additional evidence provided and the activities of daily living could not be obtained during the relevant timeframe, and therefore there was insufficient evidence provided to fully evaluate the claim. *Id.* Dr. Sampson also noted that the recent treatment did not occur within the DLI timeframe. *Id.* Dr. Sampson affirmed the finding that plaintiff was not disabled. (AR 96).

### C.     The ALJ's Decision on September 10, 2020

Following the remand, the ALJ again concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act based on her application for DIB from the AOD, June 30, 2005, to the DLI, December 31, 2010. (AR 735–58). When determining whether an individual is eligible for DIB, the ALJ is required to follow a five-step sequential evaluation. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). It is this process that the court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See id.*

The ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past

relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See id.* The claimant bears the burden to prove disability for the first four steps of the analysis. *See McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983). The burden then shifts to the Commissioner at step five. *See id.* When considering a claim for DIB, the Commissioner must also determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the SSA provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

Here, the ALJ made the following findings of fact and conclusions of law:

(1) The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

(2) The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 30, 2005 through her date last insured of December 31, 2010 (20 CFR 404.1571 *et seq.*).

(3) Through the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)).

(4) In the alternative, through the date last insured, the claimant had the following severe impairments: gastroesophageal reflux disease and psychosis (20 CFR 404.1520(c)).

(5) In the alternative, through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)

(6) In the alternative, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) EXCEPT: claimant can frequently balance, stoop, kneel, crouch, crawl, and/or climb ladders, ropes, scaffolds, ramps, or stairs; limited to simple, routine tasks; occasionally interact with supervisors, co-workers, and the general public; occasionally adjust to changes in workplace settings; limited to applying commonsense understanding to carry out uninvolved written or oral instructions;

15

and limited to dealing with problems involving a few concrete variables in or from standardized situations.

(7) Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

(8) The claimant was born on . . . 1973 and was 37 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

(9) The claimant has at least a high school education (20 CFR 404.1564).

(10) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(11) Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

(12) The claimant was not under a disability, as defined in the Social Security Act, at any time from June 30, 2005, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(g)).

(AR 742–52). The Appeals Council provided a written response to plaintiff's exceptions to the decision and found no specific reason to support the written exceptions, that the decision complies with orders of this court and the Appeals Council, and that the additional evidence from Dr. Yu submitted by plaintiff did not show a reasonable probability that it would change the outcome of the decision. (AR 712–14).

## IV. ANALYSIS

### A.    Overview

The Commissioner's motion for summary judgment argues that substantial evidence supports the ALJ's decision finding that plaintiff was not disabled from June 30, 2005 (the AOD) through December 31, 2010 (the DLI). (Docket no. 19 at 11–20). Plaintiff filed an opposition to the Commissioner's motion that attempts to refute various points made in the Commissioner's

16

motion. (Docket no. 21). The Commissioner filed a reply on August 4, 2023. (Docket no. 23).
For the reasons discussed below, the undersigned recommends a finding that the ALJ's decision
is supported by substantial evidence and that the motion for summary judgment be granted.

**B.      The additional evidence submitted by plaintiff after the ALJ's decision was
         properly evaluated by the Appeals Council and should be considered by this
         court when evaluating the ALJ's decision.**

In her complaint, plaintiff alleges that the additional medical evidence submitted to the
Appeals Council was not reviewed or, if it was reviewed, was not considered. (Docket no. 1 at
4). The Appeals Council will review a case when it receives additional evidence that is new,
material, and relates to the period on or before the date of the hearing decision, and there is a
reasonable probability that the additional evidence would change the outcome of the decision.
20 C.F.R. § 404.970(a)(5). The additional medical evidence submitted by plaintiff includes
multiple "amended" medical notes from Dr. Yu, including three from the relevant period.[6] (AR
723–33). In declining to review the ALJ's decision, the Appeals Council noted that plaintiff
submitted "medical records from Dr. Benson Yu, dated March 31, 2004 through October 31,
2020 (11 pages)," but it found "that this evidence does not show a reasonable probability that it
would change the outcome of the decision."[7] (AR 712). This language shows the Appeals
Council did review the additional medical evidence. Whether the ALJ's findings, in light of the
additional medical evidence, are supported by substantial evidence is discussed below.

---

[6] The materials before the ALJ included Dr. Yu's records that were made at the time of
his examinations, including those during the relevant period. (AR 548–83).

[7] There is also no evidence that plaintiff demonstrated good cause under 20 C.F.R. §
404.970(b) for submitting this evidence after her DIB claim went through initial review,
reconsideration, a decision by the ALJ, the denial of review by the Appeals Council, a case filed
with this court, a remand to the Appeals Council, a remand to the ALJ, and another decision by
the ALJ. However, the Appeals Council only cited the reasonable probability to change the
outcome of the decision as their justification for declining to review.

In *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), the Fourth Circuit provided guidance for how this court should consider new evidence first presented at the Appeals Council stage when reviewing the decision of the ALJ. In *Meyer*, the ALJ found that Meyer's assertions were inconsistent with the medical evidence of record, as the records did not show restrictions placed on Meyer by a treating physician that would be expected for someone alleging totally disabling symptoms. *Id.* at 703. When Meyer sought review of the Appeals Council, he submitted new evidence not before the ALJ, including an opinion letter from his treating physician describing Meyer's injuries and long-term restrictions. *Id.* The Appeals Council denied Meyer's request for review, stating that it found the information does not provide a basis for changing the ALJ's decision, and it noted that the physician's letter was part of the record. *Id.* at 704.

The Fourth Circuit expressed that, even when the Appeals Council does not articulate its reasoning when it rejects new evidence and denies review, it does not render judicial review impossible. *Id.* at 706–07. The Fourth Circuit pointed to examples where it has affirmed and reversed the ALJ's decision due to new evidence provided. *Id.* at 707 (citing *Smith*, 99 F.3d at 638–39; *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). However, when determining whether substantial evidence supports the ALJ's findings, the Fourth Circuit made clear that the record as a whole must be considered. *Id.* at 707. In *Meyer*, the court remanded the case to the SSA to assess the probative value of the new evidence. *Id.* Thus, when determining whether substantial evidence supports the ALJ's determinations, this court should use the entire record, not just the evidence before the ALJ at the time of the decision.

18

C.   **Even considering the new medical evidence presented, the ALJ's step two finding that no severe medically determinable impairment existed between June 30, 2005 and December 31, 2010 is supported by substantial evidence.**

At step two, the ALJ found that there were no medical signs or laboratory findings to substantiate the existence of a severe medically determinable impairment between the AOD and the DLI. (AR 742). The ALJ noted that it was plaintiff's burden to prove that she was disabled and there were almost no signs in the record during the relevant period at issue.[8] (AR 743). While plaintiff had some GERD, chest pain, and out-of-range Hepatitis B issues in 2009, the record includes no evidence that these conditions had more than a minimal effect on her work-related functioning. (AR 743). Additionally, the ALJ stated that there was some evidence of severe impairments prior to the AOD and after the expiration of the DLI, but these were not indicative of a severe impairment during the relevant period. *Id.* As a result, the ALJ found there were no medical signs or laboratory findings to substantiate the existence of a severe impairment from the AOD through the DLI. *Id.*

The additional medical evidence submitted by plaintiff at the Appeals Council stage (AR 728–30) includes more substantive information for the relevant period than what was before the ALJ at the time of his decision (AR 552–53, 582–83). The notes that are from the relevant period and shortly afterwards contain assessments that include diagnoses for GERD with hiatal hernia, Hepatitis B, and paranoid personality disorder. (AR 728–31). GERD and Hepatitis B were adequately addressed in the ALJ's decision, as the ALJ noted that plaintiff had a normal

---

[8] Signs are "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1502(g).

EKG, no exercise, no pain, and no evidence that Hepatitis B had a more than minimal effect on plaintiff's work-related functioning. (AR 743). That conclusion is supported by a review of the existing evidence from the relevant period, in combination with the new medical evidence. (AR 552–53, 728–31). For example, the only evidence concerning plaintiff's complaint about an unbearable stomachache from 2007 or being immobilized in November and December 2010 are plaintiff's own representations, as there are no signs or laboratory findings to support plaintiff's claims during the relevant period. (AR 728, 731).

Furthermore, plaintiff states in her opposition to the motion for summary judgment that her doctor believed that the hiatal hernia did not require treatment and he was managing her GERD using PPI. (Docket no. 21 at 2). Plaintiff further alleges that her condition became much worse when she was unable to manage her medication after the 2004 hospitalization to the point where she was immobilized and had severe pain radiating to the left side of her body. *Id.* However, as plaintiff admits, the worsening of her conditions was due to her failure to take her prescribed medication. *Id.* As her doctor believed that her GERD was reasonably manageable through medication, the lack of compliance with her prescribed treatment cannot manufacture a medically determinable impairment. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.") (citations omitted); *Burch v. Apfel*, 9 Fed. App'x 255, 260 (4th Cir. 2001) ("The regulations make clear that disability benefits are unavailable to a claimant who does not follow the prescribed treatment.") (citations omitted).

On the other hand, plaintiff's paranoid personality disorder presents a different set of issues. While the ALJ wrote that there were almost no signs in this case during the relevant period, he did note that there was some evidence of severe impairments prior to the AOD and

after the DLI, but those are not indicative of a severe impairment during the relevant period. (AR 743). While the new medical evidence refers to plaintiff's mental health during the relevant period, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. [The SSA] will not use [plaintiff's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." 20 C.F.R. § 404.1521.

Dr. Yu's "amended" notes concerning plaintiff's mental state in November 2019 and March 2010 primarily include his observations that plaintiff was uncooperative and anxious, as well as plaintiff's statements that she was self-isolating, had constant auditory hallucinations, and was having delusional thoughts. (AR 728–31). These limited notes are from a physician who was primarily treating plaintiff's abdominal and chest pain, and they do not rise to the level of objective medical evidence from an acceptable medical source that is required to establish a mental impairment. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230 (4th Cir. 2011) (holding that a diagnosis, without more, does not establish that claimant suffers from any particular symptoms or limitations). During the relevant period plaintiff did not seek treatment from a mental health provider, nor is there any psychiatric evaluation on record during that time. Therefore, the undersigned recommends a finding that there is substantial evidence supporting the ALJ's determination that the medical evidence does not substantiate the existence of a medically determinable impairment during the relevant period and that plaintiff was not disabled from the AOD to the DLI.

**D.   The ALJ's alternative findings at step three are supported by substantial evidence.**

The ALJ made an alternative finding that plaintiff had the severe impairments of GERD and psychosis. (AR 743). In doing so, the ALJ determined at step three that, through the DLI,

plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1.

(AR 743–45). The ALJ noted that the medical evidence failed to show any current upper

gastrointestinal hemorrhage; any stricture, stenosis, or obstruction of the esophagus; or any

peptic ulcer disease. (AR 743). As for plaintiff's psychosis, the ALJ found that plaintiff was

moderately limited in her ability to (1) understand, remember, or apply information; (2) interact

with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage herself. (AR

744). Because plaintiff's mental impairments did not cause at least two "marked" limitations or

one "extreme" limitation, the "paragraph B" criteria is not satisfied. *Id.* The ALJ also remarked

that this determination is supported by the lack of any significant mental health evidence during

the period in issue, and plaintiff did not seek any mental health treatment from March 2004 until

several years after the DLI. *Id.* The ALJ also determined plaintiff did not meet the requirements

of "paragraph C," which requires a medically documented history of a mental disorder for a

period of at least two years and that the evidence shows both: (1) plaintiff relied "upon mental

health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the

symptoms and signs of your medical disorder;" and (2) "despite your diminished symptoms and

signs, you have achieved only marginal adjustment." 20 C.F.R. Part 404, Subpart P, App. 1, §

12.00(G)(2). (AR 745). The ALJ noted that there was no documentation in the record that

plaintiff met such requirements. *Id.*

As it relates to the GERD evaluation, there is no evidence in the record that would

support a determination that her GERD met or medically equaled listing-level severity during the

relevant period. While Dr. Yu suggested that plaintiff might have peptic ulcer disease in

February 2011, that suggestion is couched in language that is not definitive, as Dr. Yu stated that

plaintiff's diagnosis is "[m]ost likely GERD, differentials Peptic Ulcer Disease, Hiatal Hernia," and there is no objective medical evidence to support Dr. Yu's suggestion.  (AR 731). Furthermore, that reference to potential peptic ulcer disease came after the DLI.

For the psychosis impairment, the new medical records and the other medical records from the relevant period do not provide support for anything beyond a moderate limitation for each of the four relevant categories.  As noted, there is little in the record from the relevant period about plaintiff's mental health beyond Dr. Yu's observations described in his "amended" records, so it is difficult to justify anything beyond a moderate limitation for each of these categories.  Plaintiff argues in her opposition to the motion for summary judgment that she has trouble with her concentration, interacting with others, managing herself, as well as understanding, remembering, or applying information, but there is nothing in the record to support that those conditions existed during the relevant period.  (Docket no. 21 at 2).  Moreover, there is no indication in the record of a medical history of a mental disorder for a period of two years during the relevant period, and plaintiff never relied on mental health therapy, psychosocial support(s), or a highly structured setting(s) to diminish the symptoms and signs of a mental disorder during the relevant period.  Accordingly, plaintiff did not have any impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1, and the ALJ's decision at step three is supported by substantial evidence.

E.      **The ALJ's alternative RFC is supported by substantial evidence.**

The ALJ made a further alternative finding that, through the DLI, plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c) "EXCEPT: [plaintiff] can frequently balance, stoop, kneel, crouch, crawl, and/or

climb ladders, ropes, scaffolds, ramps, or stairs; limited to simple, routine tasks; occasionally interact with supervisors, co-workers, and the general public; occasionally adjust to changes in workplace settings; limited to applying commonsense understanding to carry out uninvolved written or oral instructions; and limited to dealing with problems involving a few concrete variables in or from standardized situations." (AR 745). The ALJ noted that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* In doing so, the ALJ recounted plaintiff's testimony at her hearings that she had difficulty ambulating due to her medication, suffered from depression, suffered from extensive stomach aches that resulted in loss of functioning, and struggled with auditory hallucinations, concentration issues, and her memory. (AR 746). The ALJ found that GERD and psychosis could reasonably be expected to cause the alleged symptoms, but plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.*

Due to the limited medical records from June 2005 through December 2010, the ALJ considered records prior to the AOD and after the expiration of the DLI in formulating the RFC. *Id.* As to plaintiff's physical limitations, the ALJ noted that records from August 2003 showed plaintiff had a good range of motion, normal strength, and unremarkable cardiovascular, pulmonary, and abdominal examinations. *Id.* While plaintiff had some complaints of chest pain in November 2009 with GERD, plaintiff had a normal EKG with no pain and no murmur. *Id.* In July 2011, plaintiff had an exam of her chest, cervical spine, and thoracic spine performed, finding only mild degenerative changes on the thoracic spine and no other significant issues. *Id.* Plaintiff had further unremarkable findings in August, September, and October 2011. (AR 746–

47).  In September 2012, well after the DLI, Dr. Furst indicated plaintiff had issues with vertigo

and imbalance, and a diagnostic test found early Meniere's disease in the right ear and only mild

sensorineural hearing loss in both ears.  (AR 747).  In October 2012, a letter from Dr. Yu

indicated that plaintiff experienced persistent vertigo, slowly progressive dysphasia, and severe

pain in the abdominal area, but the ALJ noted that the objective medical evidence from that

period does not support the extent of plaintiff's symptoms prior to the DLI.  *Id.*  The ALJ

concluded that, to the extent that plaintiff's November 2009 diagnosis of GERD resulted in

functional limitations up to the DLI, these resulted in, at most, a limitation to medium work with

additional postural limitations detailed in the RFC.  *Id.*

  As to plaintiff's mental condition, the ALJ noted that during her hospitalization in March

2004, she calmed down considerably and had no more than moderate symptoms in the

psychiatric symptoms assessment.  (AR 747).  Even though plaintiff's mental health treatment

was limited until February 2016 (six years after the DLI), the ALJ noted that he believed it was

relevant to address plaintiff's condition after the DLI.[9]  *Id.*  In February 2016 plaintiff indicated

she wanted to see a psychotherapist and nurse practitioner Jacobowitz noted plaintiff was in a

state of psychosis with difficulty concentrating, anxious mood, rambling speech, limited insight,

and impaired judgment.  (AR 676, 747).  However, in March 2016, plaintiff's condition had

improved, and Dr. Sandhu noted normal attention and concentration, intact memory, full

orientation, intact associations, and normal speech.  (AR 691, 747).  In addition, a consultative

examination in January 2014 (when plaintiff was not undergoing any mental health treatment)

indicated some paranoid and delusional behavior with mild anxiety, impaired attention,

---

[9]Plaintiff did attend three counseling sessions and have a psychiatric assessment in June
2015 and an additional counseling session in September 2015.  (AR 662–66, 265–69, 284–85).

concentration and memory but also noted plaintiff was alert and properly oriented. (AR 601, 747). At that time, plaintiff was diagnosed with a paranoid personality disorder and delusional disorder and it was indicated that left untreated her psychological functioning will continue to deteriorate. (AR 602). While plaintiff made various complaints, it was believed that she would not engage in any meaningful treatment since she has a history of noncompliance with treatment. (AR 601).

The ALJ found that the objective medical evidence, as well as plaintiff's symptoms presented contemporaneously with medical appointments, supported few, if any, limitations with recall, memory, concentration, and judgment. (AR 747). This finding was based in part on the sparse evidence in record concerning plaintiff's mental health during the relevant period. *Id.*[10] Further, the ALJ noted that the predominant source of countervailing evidence came from symptoms presented in connection with the social security disability process, especially from plaintiff's testimony at the hearings. (AR 748). The ALJ found plaintiff's testimony unsupported by the signs and symptoms observed during her medical and psychological appointments and thereby afforded plaintiff's testimony little weight. *Id.* The ALJ wrote that plaintiff did not meet her burden in proving limitations, as the record did not include evidence of a severe mental impairment from the AOD to the DLI. *Id.*

The ALJ also addressed the opinion evidence provided in the record. The ALJ remarked that the state agency medical consultants found insufficient evidence to determine the existence of a severe mental impairment, which the ALJ noted is consistent with the record. *Id.* The ALJ afforded the Medicaid disability determination, opinion of Dr. Yu, opinion of Dr. Chhabra,

---

[10] The contemporaneous notes from Dr. Wu's examination of plaintiff in November 2009 and March 2010 make no reference to any mental health concerns. (AR 552–53).

opinion of Dr. Badday, opinion of Dr. Gambles, and report from Phoenix Counseling Services little weight. (AR 748–50). For the most part, the ALJ discounted these opinions because they occurred years after the DLI and gave no indication that the findings applied to the relevant period, but he also noted that many were not fully consistent with or supported by the unremarkable medical evidence on record and/or lacked specific functional limitations. *Id.*

The evidence from the relevant period, including the additional medical evidence submitted, does not provide any significant objective records that would support further limitations to the RFC. The records from Dr. Yu indicate that plaintiff represented, without any objective medical evidence, that she was having difficulty moving due to her abdominal pain, vomited blood in September 2010, was immobilized in November and December 2010, and had auditory hallucinations. (AR 728–31). The records also provide that Dr. Yu observed that plaintiff was in a paranoid state and was not cooperative, but there is nothing more in the record on plaintiff's psychiatric condition other than Dr. Yu's observations on a few occasions. (AR 728–29, 731). Coupled with unremarkable objective physical records and the lack of mental health records from the relevant period, and noting that a vast majority of the evidence that could support additional limitations was created years after the DLI, there is no need for additional limitations to be included in the RFC than those already included by the ALJ. In fact, the ALJ was likely overly generous in formulating the RFC, as he gave plaintiff the benefit of the doubt when he considered medical evidence outside of the relevant period when formulating the limitations of the RFC.

Similarly, the ALJ's weighing of the expert opinions was appropriate, as almost all the opinion evidence came from years after the relevant period. Plaintiff argues that the opinion of Dr. Gambles should have been given more weight, but plaintiff did not provide any other

27

rationale beyond stating that she saw Dr. Gambles as part of the disability insurance claim process. (Docket no. 21 at 4). The ALJ explained that the opinion of Dr. Gambles was afforded little weight, as the examination took place more than three years after the DLI, and the opinion of such significant limitations was not consistent with the lack of significant mental health treatment during the period in issue, as well as the generally unremarkable mental status examinations both prior to the AOD and subsequent to the DLI. (AR 749). That determination is supported by substantial evidence.

Also, plaintiff's opposition to the motion for summary judgment provides little support for additional limitations. Multiple times throughout her opposition, plaintiff cites to the diagnoses from Dr. Iannucci in June 2015, Dr. Bouhouch in September 2018, and Dr. Myint in April 2022 as evidence of diagnoses that relate back to her 2004 hospitalization. (Docket no. 21 at 1–4). Plaintiff also attached the first page of the records from the three visits. (Docket no. 21-1 at 4–6). First, diagnoses and observations made years after the expiration of the DLI that appear to be somewhat similar to those made in 2004, without more, does not come close to proving that the ALJ's RFC was not supported by substantial evidence. The difficulty with plaintiff's argument is that there is a lack of objective evidence **from the relevant period** that would justify additional limitations, and an attempt to relate back diagnoses and records that were made several years, and in one case over a decade, after the DLI does not make up for the lack of objective evidence. Second, the notes from the visit with Dr. Iannucci in June 2015 do not indicate that any diagnosis or observation related back to the relevant period, nor do the notes even allude to the relevant period. (AR 265–69). Third, the complete notes from the visits with Dr. Bouhouch in September 2018 and Dr. Myint from April 2022 are not part of the Administrative Record. Finally, the partial records provided by plaintiff do not have any

indication that they relate back to the relevant period. (Docket no. 22-1 at 4, 6). Given that these visits were made well after the relevant period, like many of the other records reviewed by the ALJ, they do not justify any additional limitations to the RFC beyond what the ALJ provided.[11] Accordingly, the limitations included in the RFC by the ALJ are supported by substantial evidence.

   **F.   The ALJ's alternative findings at step four and five are supported by substantial evidence.**

   The ALJ found that plaintiff was unable to perform any past relevant work through the DLI at step four, but he also found that jobs existed in significant numbers in the national economy that plaintiff could have performed through the DLI at step five. (AR 750–52). The ALJ noted that taking into consideration plaintiff's age, education, work experience, and RFC, the vocational expert testified that plaintiff would have been able to perform the requirements of representative occupations such as laundry laborer, floor waxer, and cleaner II. (AR 751). The vocational expert testified that, while there was no conflict with the Dictionary of Occupational Titles ("DOT"), there are limitations in the RFC that the DOT does not address. *Id.* The vocational expert testified that her opinion about the effects of those additional limitations is based on her professional experience both generally and with the specific occupations he identified. *Id.* The ALJ found there was a reasonable basis for the vocational expert's testimony. *Id.* Based on this testimony, the ALJ concluded that, considering plaintiff's age,

---

[11] In her opposition, plaintiff most often cites the portion of the memorandum in support of the motion for summary judgment that discusses the RFC when arguing for the consideration of the diagnoses and observations of Dr. Iannucci, Dr. Bouhouch, and Dr. Myint. (Docket no. 21 at 1–4). However, the justification for why these diagnoses and observations do not support additional limitations in the RFC can also be applied to why these diagnoses and observations do not support the finding of a medically determinable impairment or an impairment of listing-level severity.

education, work experience, and RFC, plaintiff could have made a successful adjustment to other

work that existed in significant numbers in the national economy through the DLI.  (AR 752).

As a result, the ALJ found plaintiff was not disabled.  *Id.*

For a vocational expert's testimony to be relevant and helpful, "it must be in response to

proper hypothetical questions which fairly set out all of claimant's impairments."  *Walker v.*

*Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citing *Stephens v. Sec'y of Health, Educ. & Welfare*,

603 F.2d 36 (8th Cir. 1979)).  "Where the ALJ properly formulates his hypothetical to accurately

reflect the condition and limitations of the claimant, the ALJ is entitled to afford the opinion of

the vocational expert great weight."  *Bass v. Colvin*, 2014 WL 5147562, at *3 (W.D.N.C. Oct.

14, 2014) (citing *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984)).  Furthermore, the vocational

expert is not restricted to only testifying about publicly available sources such as the DOT, as the

expert may also invoke "data otherwise developed from their own 'experience in job placement

or career counseling.'"  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1152–53 (2019).

In reviewing the testimony of the vocational expert, the ALJ asked about a hypothetical

individual of plaintiff's age, education, and past work; that can do medium exertional level jobs;

is limited to simple, routine tasks; can only occasionally interact with supervisors, co-workers,

and the public; can only occasionally adjust to change in workplace settings; is limited to

applying common sense understanding to carry out uninvolved written or oral instructions; is

limited to dealing with problems involving a few concrete variables in or from standardized

solutions; is limited to frequently climbing ropes, ladders, scaffolds, ramps, stairs, balance,

stoop, kneel, crouch, and crawl; and cannot work at a production rate pace.  (AR 783–84, 786).

The vocational expert provided that this hypothetical individual would not be able to do any of

plaintiff's past relevant work but would be able to work as a laundry laborer, floor waxer, and

cleaner II. (AR 784–86). The ALJ's hypothetical directly matches the age, education, work experience, and RFC of plaintiff. Furthermore, the vocational expert testified that the testimony was consistent with the DOT and her training, education, and experience. (AR 787–88). As such, the ALJ was entitled to give the vocational expert's testimony great weight. Therefore, the ALJ's determination that, through the DLI, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed is supported by substantial evidence. Accordingly, the ALJ's alternative determination that, even if severe impairments existed, plaintiff was not disabled from the AOD to the DLI is supported by substantial evidence.

## V. CONCLUSION

Based on the foregoing, it is recommended that the Commissioner's final decision denying benefits for the period of June 30, 2005 to December 31, 2010 be affirmed. Accordingly, it is recommended that the Commissioner's motion for summary judgment (Docket no. 18) be granted.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 17th day of August, 2023.

_____/s/_____
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia